Davis vs. Citizens' Bank et al.

No. 9925.

S. W. DAVIS VS. CITIZENS' BANK OF LOUISIANA AND SHERIFF.

S. W. DAVIS VS. ADAMS & COCKBURN AND SHERIFF.

CITIZENS' BANK OF LOUISIANA VS. THOMAS B. RHODES.—S. W. DAVIS, THIRD OPPONENT.

ADAMS & COCKBURN VS. RHODES, SWEET & CO.—S. W. DAVIS, THIRD OPPONENT.

THOMAS B. RHODES VS. CHAS. E. BLACK, S. W. DAVIS ET AL.

(Five Consolidated Cases.)

| 39 | 523 |
| 44 | 929 |
| 39 | 523 |
| 106 | 87 |
| 39 | 523 |
| 115 | 799 |

| 39 | 523 |
| 122 | 656 |

If, prior to a judicial sale, in enforcement of a first mortgage and vendor's privilege ranking all others on the property, an agreement is made between the seizing creditor and debtor, that the former will bid off the property if not run up above the amount of his debt; and that, in such case, he will resell to the debtor, or any one named by him, at an agreed price, within a delay fixed, such an agreement is lawful and does not prevent the title under such sale from actually passing to the purchaser, subject to the right of redemption, and it extinguishes all mortgages on the property; and judicial mortgages will not reattach to the property unless it is returned to the ownership of the debtor.

When, in such case, the property is resold to a third person named by the debtor, for a price actually paid by such purchaser, the fact that, in a contemporaneous writing, it had been agreed between this purchaser and the original owner that the former would resell to the latter or any person designated by him, on terms and conditions therein stipulated, does not prevent the purchaser from becoming the real owner, subject only to the right of redemption on the terms agreed. Therefore, judicial mortgages against the original owner did not attach to the property in the ownership of such purchaser.

When, subsequently, the original owner ceded his right of redemption to another, and the purchaser, with the consent of such former owner, sells the property outright to the person so designated, for a price partly paid in cash and the balance in a note secured by mortgage, without reserve of any right of redemption expressed in the deed or in any writing whatever, neither the original owner nor his creditors can attack such title or mortgage except on grounds of fraud, which are not established in this case.

APPEAL from the Eighth District Court for the Parish of East Carroll. *Delony*, J.

---

*J. M. Kennedy* and *W. G. Wyly* for S. W. Davis and C. E. Black.

*Farrar & Kruttschnitt* on the same side.

*Henry C. Miller* for the Citizens' Bank.

*J. W. Montgomery* for Adams & Cockburn.

---

The opinion of the Court was delivered by

FENNER, J.   The Citizens' Bank and Adams & Cockburn, being judgment creditors of Thomas B. Rhodes, issued writs of *fi. fa.*, and seized thereunder the Airlie plantation with the movable effects thereon.

The first two suits above enumerated are injunction proceedings against said seizures of Airlie plantation by S. W. Davis, who claims to be the owner thereof.

The two following cases present issues raised on third oppositions, filed by S. W. Davis, who claims to be the lessor of Rhodes and, as such, to have a lien and preference on the movables seized, over the seizing creditors.

In the meantime, Charles E. Black, a mortgage creditor of S. W. Davis, had seized "Airlie" under executory process, and the last named case is an injunction proceeding against that seizure taken out by T. B. Rhodes, who denies Davis' ownership of the plantation and his right to mortgage, and claims that he, Rhodes, is and has always been the owner.

The leading question involved is the ownership of "Airlee," and that hinges on the construction and effect to be given to various contracts and agreements touching the title to said plantation.

T. B. Rhodes bought the "Airlee" plantation in 1869, on terms of part cash and balance in notes secured by mortgage and vendor's lien.

W. W. Carson, a non-resident of the State, became the owner of these notes.

In 1874, Carson obtained judgment by confession against Rhodes on one of these notes, with stay of execution until December 1st of that year. Carson wanted his money and did not want the plantation.

Rhodes wanted the plantation, but had no money. On the contrary, he was insolvent. He not only owed the large debt to Carson, but he also owed Adams & Cockburn $3303, besides interest, on which judgment was recovered in 1875, and recorded as a judicial mortgage on Airlee; he owed the Citizens' Bank $12,000, besides interest, on which judgment was afterwards recovered in 1877 and recorded; and he owed Graham, Black & Co. $4894, with what other debts we know not.

Both parties were satisfied, and the result makes it certain that, if the plantation was sold under Carson's judgment, it would not bring the amount of his claim and that he could only save himself by buying in the property, which he was exceedingly averse to doing. Still he was unwilling to extend his debt without, at least, partial payment of which he was in need.

Rhodes, on the contrary, set great value on the plantation and believed that, if he could effect any arrangement by which he could retain the management of the plantation, he could make it yield a revenue sufficient to pay off, not only Carson's debt, but his other creditors.

Under these circumstances, it was agreed between the parties that

Carson should issue execution on his judgment; that if there were no other bidder at the cash offering he would not bid; and that, at the second offering on twelve months' credit, he would bid off the property, if it were not run up above his debt. He further agreed that he would sell the place back to Rhodes or to any person whom Rhodes might designate, at any time within thirty days after the sale, provided he, Carson, were paid $3000 in cash, and the balance in annual installments of $4000, properly secured, up to the amount of his entire debt.

Accordingly, execution was issued; the place was seized and Rhodes was appointed sheriff's keeper; the cash offering failed for want of bidders; there were no bidders at the credit offering; and the place was adjudicated to Carson at the price of one thousand dollars.

The thirty days allowed to Rhodes, within which he had the right to claim a resale under the terms of the agreement, expired without the exercise of this right; but some days later, viz: on June 24, 1876, Rhodes presented Charles E. Black as a purchaser, and Carson executed a conveyance of the property to Black for the price of $16,867.87, of which $3000 was paid in cash, and the balance on terms conforming to the agreement, secured by mortgage and vendor's lien. Rhodes intervened in the act and declared " that he does hereby assent to all the clauses of this deed, and hereby releases unto said Black all and any right he may have in and to said land."

Prior to the execution of this conveyance, a written agreement had been entered into between Black and Rhodes, too lengthy to be copied here, but the substance of which was that Black should buy from Carson, on the terms stipulated; that Rhodes should take charge of and manage the place, without salary, making all contracts, rent notes, etc., in favor of Black; that Black was to receive the whole of the revenues, which were guaranteed not to fall beneath a sum fixed, under penalty of termination of Rhodes' rights; and that "when the revenues realized by said Black from said plantation shall have equalled the aforesaid sum of $16,687.67, with interest, together with the sum of $4984 now due by said Rhodes to Graham, Black & Co., with interest, and any other amount that said Rhodes may become indebted to said Black or said Graham, Black & Co., then the said Black shall sell, transfer and convey unto said Rhodes or any one he may designate, all of said plantation, etc.; said Black to convey only such title as he shall acquire from said Carson "—and further binding himself not to sell, encumber or mortgage the property to the prejudice of this agreement. Under this contract Rhodes proceeded to operate the plantation.

On January 15, 1878, Rhodes, having become indebted to S. W. Davis,

executed a sale of all his rights under the contract with Black to Davis, authorizing him to pay and discharge the claim of Black and to demand the conveyance of the property, if he should desire so to do. A counter-letter was executed, however, explaining that the sale or act of subrogation just mentioned was intended as a security for a loan of $2500, then made, and for a past due indebtedness of $5600, owing by Rhodes to Davis. This counter-letter was not recorded and was not communicated to Black.

In February, 1880, Davis, armed with the transfer and subrogation from Rhodes, negotiated and obtained from Black a sale of the plantation at a price fixed at $28,812, which represented the entire amount expended by Black, of which sum it was stated that $10,445 had been repaid to him out of the revenues of the plantation; the further sum of $13,281 was paid in cash by Davis, and, for the balance of $5086 Davis gave his note secured by mortgage and vendor's lien on the property.

Rhodes intervened in the act to take cognizance of it, and to declare that Black had fully acquitted all his obligations under his contract with Rhodes.

There is no counter-letter or written agreement of any kind between Rhodes and Davis affecting in any manner the latter's title, and we do not see how Rhodes can dispute it. There is evidence to show that at the time of Black's sale to Davis, it was contemplated that John Chaffe & Sons should buy the place from Davis and give to Rhodes a right of redemption on terms similar to those which had been made by Black; and such an act had been prepared by the notary. But it was never executed. Chaffe & Sons testify that they had never agreed to enter into such a contract; and, though Rhodes swears that Davis had bound himself to procure such a contract from Chaffe & Sons, and that this was the condition upon which he received the title, his testimony is unsupported and his charge of such fraud against Davis is silenced by his subsequent conduct by which, in various ways, he recognized Davis' ownership.

Adams & Cockburn and the Citizens' Bank allege and contend that "the shifting of Rhodes' title, first to Carson and then to Black, was a mere paper transaction and a simulation, intended to defeat Rhodes' creditors; that there was no actual seizure under Carson's execution, and that his purchase purported to be for only $1000; that the sheriff's sale divested Rhodes of neither ownership nor possession; that Carson's debt was not paid or settled thereby; that no money was paid by him for the property, nor was his execution or debt

actually credited with his bid, but, on the contrary, he still held the notes which he was pretending to collect of Rhodes, which were afterwards paid for Rhodes by Black; that this shifting of title and apparent change of ownership was part and parcel of an agreement and prearranged scheme for the purpose of baffling Rhodes' creditors; that Carson never went into possession under his title, nor did Black; that Rhodes remained in possession as owner, made and shipped his crops and generally acted as owner; that it was never intended that Black should become the owner, and that his nominal title was simply a form of security for his debt and for advances to Rhodes, and that mode of security was adopted for the purpose of defrauding Rhodes' creditors; that Davis, when he took the title from Black, well knew its defects and fraud, and, by his purchase, endeavored to further said fraud."

We fail utterly to discover any facts proven or principle of law to sustain these pretensions.

There is no dispute that Carson held a claim amounting to $16,867, secured by special mortgage and vendor's privilege upon the plantation, which ranked all other creditors of Rhodes. Hence, such creditors had no possible claim on this property until this debt was paid; and a judicial sale for its enforcement conveyed the property free from their claims.

Although some persons entertained a higher idea of its value, there is no proof that there was any one willing to pay more than Carson's debt for the property. At all events, the property, after all legal advertisements, was twice exposed at public sale, first for cash and then on credit; and if these creditors or any other person had bid the amount of Carson's claim, the property would have been adjudicated to them. But neither they nor other bidder appeared at these sales.

There was no *consilium fraudis*, because there was no occasion or motive for fraud; there was no *eventus damni*, because the public sale affords legal proof that the property would not command a price sufficient to leave any surplus for these creditors.

The whole transaction was perfectly legitimate. Carson did no more than he had the legal right to do in executing his judgment and in bidding in the property. He had an equal right to make the contract with Rhodes to reconvey, on compliance with the terms and conditions stipulated.

The adjudication undoubtedly conveyed the ownership to Carson, subject to his obligation to reconvey on compliance with those conditions within the delay stipulated. Rhodes was in possession as sher-

iff's keeper, and his possession continued in that capacity until terminated by delivery to the purchaser. The sale to Black rendered the delivery to Carson unnecessary, and, after that sale, the continued possession of Rhodes was the possession of Black, under the terms of the contract between them. Therefore, the possession of Rhodes loses all significance as an *indicium* of simulation.

It is perfectly clear that the sale to Carson divested Rhodes' ownership and ousted all inferior mortgages on the property. Judicial mortgages, prior or subsequent, against Rhodes, could never afterward attach to the property, unless it returned to the ownership of Rhodes.

It is contended that such return was operated by the transfer from Carson to Black, and the agreement between Rhodes and Black; that the real ownership was thereby transferred to Rhodes, and that Black held the title merely as a figurative or hypothecary security for debts due to him, and advances made by him for Rhodes' account.

We have, heretofore, recited at length the terms of the contract between Rhodes and Black, without finding in it a single feature supporting such a construction of it.

It is the plainest possible case of a perfect and complete sale from Carson to Black, containing all the essential elements of the thing sold, the price and the consent; and the contract between Rhodes and Black merely engrafts upon it a right of redemption in favor of the former on the terms stated.

There is no feature of simulation about the transaction ; no dispute that Black actually paid the cash part of the price, and was bound to pay the balance irrespective of the results of his contract with Rhodes for the working of the plantation.

Treating this as a *vente à rémeré*, from which it differs because the right of redemption is stipulated, not in favor of the vendor, but of a third person, it is clear that the ownership passed from Carson to Black, and, quoting our language in a recent case, " from the moment of the execution of the act, the vendee becomes the master of the property, his title subject to be divested only by the exercise of the right to redeem, and unless that right is exercised within the term stipulated, he remains absolute owner of the property." Jackson vs. Lemle, 35 Ann. 856; Levy vs. Ward, 32 Ann. 784; Duranton, Cours de Droit, vol. 16 ; Secs. 388, 389, 390; Dalloz, Vente, No. 825 ; 2 Troplong, Nos. 692, *et seq.*

Rhodes has never exercised his right of redemption. He ceded that right to Davis. He was a party to the act by which Black conveyed the property to Davis in absolute ownership and for a valuable con-

Davis vs. Citizens' Bank et al.

sideration. He has no counter-letter or written evidence of any kind contradicting or limiting the title conveyed to Davis and confirmed by him.

He cannot dispute his own declarations in this authentic act. The alleged fraud, as we have heretofore stated, is not proved, his oral testimony being contradicted by other witnesses and by his own subsequent conduct and writings.

He pretends that there was an agreement to which Davis, Chaffe & Sons and himself were parties, and of which Black was cognizant, that simultaneously with the conveyance from Black to Davis, another conveyance was to be executed from Davis to Chaffe & Sons with a right of redemption reserved to Rhodes.

Black swears that he never knew of any such agreement. The various members of the firm of Chaffe & Sons swear they never made any such agreement. Davis died before Rhodes' examination as a witness was completed, and, therefore, had no opportunity of contradicting it. If it were true, as stated by Rhodes, that Davis had practiced the fraud charged, it is inconceivable that he should not at once have denounced it and demanded the cancellation of the transaction. But he complained of it to nobody, and took no steps to cancel it. On the contrary, he recognized Davis' ownership in every way, took rent notes of the tenants in Davis' name, represented Davis as the owner in written applications to merchants for advances, and to Shattuck & Hoffman whom he desired to purchase the plantation from Davis on terms securing him a new right of redemption.

It is undoubtedly true that Davis was willing to sell to John Chaffe & Sons on the terms proposed in the contract prepared, but they refused to accept such a sale. We are satisfied that Davis continued willing to sell, on the same terms, to any other responsible purchaser whom Rhodes could find, and Rhodes tried to find such purchaser, but in vain. He has never found any. The attempt of Rhodes and his creditors to disregard Davis' title, under these circumstances, cannot be countenanced

These views dispose of the claims of the Citizens' Bank and of Adams & Cockburn to subject Airlie plantation to their judgments against Rhodes, and of the claim of Rhodes to annul Davis' title, and to defeat Black's mortgage.

The interventions of Davis, claiming a lessor's privilege on the movables of Rhodes on the plantation seized, are overruled for the reasons given in the case of Davis vs. Rhodes, decided this day.

Although, in some respects, the judgment appealed from is not erroneous, yet, for convenience, we shall reverse it and give such judgment as should have been rendered.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from is annulled, avoided and reversed, and it is now ordered, adjudged and decreed:

1st. That in suits Nos. 215 and 216 of the district court there be judgments in favor of plaintiff, S. W. Davis against the defendants, the Citizens' Bank of Louisiana and John D. Adams, perpetuating the injunctions therein issued, said defendants to pay costs in both courts.

2d. That in cases Nos. 217 and 218 of the district court there be judgment against the defendant, overruling and rejecting his third oppositions therein, at his cost in both courts.

3d. That in case No. 227 of the district court there be judgment in favor of defendants and against the plaintiff, rejecting the latter's demand, at his cost in both courts.